IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACOB DOY CRISS, JR., | ) | CASE NO. 1:17-CV-1257 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jacob Doy Criss, Jr., ("Criss") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of

the parties. Doc. 18.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Criss protectively filed his application for SSI on December 2, 2013, alleging a disability

onset date of August 1, 2013. Tr. 169-170, 183. He alleged disability based on the following:

bipolar, anxiety with panic attacks, agoraphobia, and palpitations. Tr. 187. After denials by the

state agency initially (Tr. 91) and on reconsideration (Tr. 107), Criss requested an administrative

hearing. Tr. 128. A hearing was held before Administrative Law Judge ("ALJ") Scott R.

Canfield on September 14, 2015. Tr. 37-77. In his February 29, 2016, decision (Tr. 20-31), the

ALJ determined that there are jobs that exist in significant numbers in the national economy that

Criss can perform, i.e. he is not disabled. Tr. 29. Criss requested review of the ALJ's decision

by the Appeals Council and, on April 26, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Criss was born in 1994 and was 19 years old on the date his application was filed. Tr. 29. He dropped out of school in ninth grade and has no past relevant work. Tr. 42, 46.

### B. Relevant Medical Evidence[1]

On March 26, 2013, police brought Criss and his mother to Lutheran Hospital because Criss had been exhibiting increasingly aggressive behavior the last two days. Tr. 238. He reported a prior diagnosis of bipolar disorder and had been off medication for a year. Tr. 238. Upon exam, he was oriented and cooperative and had normal behavior, judgment, thought content, speech, cognition, and memory. Tr. 239. He had a depressed mood, no hallucinations, and no suicidal or homicidal ideations. Tr. 239. He was diagnosed with bipolar disorder, established, worsening; an appointment was made for him with "Connections," which he and his mother seemed pleased about; and he was discharged as stable. Tr. 239-240.

On November 18, 2013, Criss saw his primary care physician, Hazem Nouraldin, M.D., for his hypertension, which was doing well. Tr. 386. Criss reported that he had been having panic attacks (racing heart, skin feeling like it was crawling) and he had not been taking his Celexa. Tr. 386. He denied chest pain or shortness of breath. Tr. 386. The visit was also a routine follow-up for his depression and he denied depressive symptoms. Tr. 386. Regarding his panic attacks, he was experiencing them several times per week with chest pain, insomnia, and palpitations. Tr. 386. Dr. Nouraldin recommend that Criss avoid substance abuse, resume

---

[1] Criss only challenges the ALJ's findings regarding his mental impairments. Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

social interaction, contact a support group, increase exercise, take his Celexa consistently, and stop smoking and eliminate caffeine. Tr. 389.

From November 22 through November 25, 2013, Criss was hospitalized at Lutheran Hospital for depression, anxiety and suicidal ideation. Tr. 258, 262. At intake, he reported that he had previously been hospitalized five years earlier, that it had not helped, and that he wanted to be released. Tr. 262. He was very angry and irritable and stated: "I was brought here against my will and I am really pissed. I am not gonna answer anything and need no help." Tr. 262. He explained that he had gotten better while he was in the emergency room and did not feel that he needed to be admitted. Tr. 262. He detailed that he had had worsening anxiety attacks the past week (racing heart, chest tightness, cold and numb feet and toes, "body feels weird"), that he could think of no reason for them, he was worried about having more, he had agoraphobia and could not go out of the house and do his normal daily activities as usual, and he had recently been started on Celexa but it made his anxiety worse so he stopped taking it. Tr. 262. He was depressed and worried, felt hopeless and helpless, and denied currently being suicidal. Tr. 262. He denied stressors but stated that he "had a kid on the way." Tr. 262. He admitted that he used marijuana "and since anxiety has been worse it triggered the attack and since then he has not smoked." Tr. 263. He disclosed feeling traumatized by having had an abusive, drug addicted father until the age of 14, when he and his mother were able to get away and their lives improved, and that his siblings had been diagnosed with bipolar also. Tr. 263. Upon exam, he was oriented, irritable to start but became more cooperative, had appropriate speech, insight and judgment, coherent thought, intact memory, and an anxious and depressed mood. Tr. 264.

Criss was treated with medication and discharged in good condition with a trial prescription for sertraline and to continue the medications he had been given at the hospital. Tr.

258, 259.  He had participated in "groups" effectively and had "no untoward events while on the unit."  Tr. 258.  His mood was appropriate, bright and hopeful.  Tr. 259.  He was feeling "much better" and the lorazepam, which was for short-term use, had reduced his anxiety to a minimum. Tr. 271.  He was diagnosed with mood disorders, bipolar disorders, bipolar II, anxiety disorder, and panic disorder with agoraphobia.  Tr. 259.  He was referred to follow-up with the Centers for Families and Children for psychological management and social intervention.  Tr. 269, 270.

On December 6, 2013, Criss went to Fairview Hospital complaining of rapid heartbeat that began one hour ago and stated that he smoked marijuana about five hours prior.  Tr. 274.  He complained of very mild chest tightness.  Tr. 274.  He was monitored for over an hour at the hospital with no heart palpitations noted and was discharged home in stable condition.  Tr. 276.

On December 11, 2013, Criss saw Dr. Nouraldin for neck and head pain.  Tr. 377.  He stated that his anxiety was stable and he denied depressive symptoms.  Tr. 377.  Dr. Nouraldin gave him a prescription for Ativan and recommended he avoid substance abuse, resume social interaction, contact a support group, and increase exercise.  Tr. 377.

On December 23, 2013, Criss cancelled an appointment with the Centers for Family and Children.  Tr. 400.

On December 24, 2013, Criss went to Fairview Hospital complaining of anxiety for the past day.  Tr. 332.  He had been out of his Ativan for two days.  Tr. 332.  He denied palpitations, numbness and hallucinations.  Tr. 332-333.  His physical and mental examinations were normal. Tr. 333.  He was discharged with a short-term prescription for Ativan and urged to follow-up with his primary care physician.  Tr. 333.

On January 3, 2014, Criss followed up with Dr. Nouraldin. Tr. 365. He denied chest pain, shortness of breath depressive symptoms and stated that his anxiety was stable. Tr. 365.[2]

On January 6, 2014, Criss was evaluated at the Center for Families and Children by Mauran Sivananthan, D.O. Tr. 393-399. He reported having anxiety attacks, running out of his Ativan, and visiting emergency rooms to get more Ativan "because the Panic Disorder was getting worse." Tr. 393. He stated that he had had five episodes where he did not sleep for four consecutive days and, during that time, experienced racing thoughts, elevated mood, goal directed activities, distractibility, and irritability. Tr. 393. He denied current depression and explained that he had felt depressed in the past but that his depression lasted "usually only 1-1.5 weeks at most." Tr. 393. He enjoyed playing video games and used to love to play basketball but mostly stayed indoors due to his anxiety. Tr. 393. His panic attacks gave him palpitations, tachycardia, tingling in fingers and toes, cold feet, and lightheadedness. Tr. 393. He was taking Ativan and Lisinopril (as well as Tramadol and Claritin) and had in the past been on Zoloft (for 2 weeks), Trazodone (did not help with sleep), Ritalin, and Celexa (made anxiety worse). Tr. 393-394. He used to smoke marijuana daily but had cut down to twice a month because it worsened his anxiety. Tr. 394. He lived in an upstairs duplex with his mother, had a good relationship with his fiancée, was close with one of his sisters and reported that his other two sisters lived out of state. Tr. 394. He was assessed with bipolar II disorder, panic disorder with agoraphobia, and generalized anxiety disorder, and was started on Lamictal for his bipolar II, Klonopin for his panic disorder and anxiety; the plan was to start an anti-depressant once the Lamictal was titrated up to a mood stabilizing dose and to taper off Klonopin once Criss engaged in therapy and was

_____

[2] In his brief, Criss alleges that he continually presented to Dr. Nouraldin with panic attacks. Doc. 13, pp. 5-6. This in inaccurate. Dr. Nouraldin's notes show "HPI [History of Present Illness]" of panic attacks (which he had been diagnosed with), and that these were "stable." See, e.g., Tr. 366 (2/21/2014), 370 (5/30/2014).

better able to manage his symptoms.  Tr. 395.  Criss agreed to start therapy and was referred for counseling.  Tr. 395-396.

Criss cancelled a follow-up appointment with Dr. Sivananthan (Tr. 401), missed his next one (Tr. 402), cancelled the next (Tr. 403), and missed the next (Tr. 404).  He attended an April 7, 2014, appointment and reported having taking his Lamictal for a month but stopped because he got a rash on his thigh.  Tr. 405.  The Klonopin was helping with his anxiety but he hadn't started therapy yet "and plans to do that soon."  Tr. 405.  His panic attacks had decreased in frequency (every other day) and he was able to manage better when they did occur and he hadn't had to go to the ER.  Tr. 405.  He had been able to play basketball again every other day.  Tr. 405.  He was sleeping eight hours a night with no problems and he had used marijuana four times since his last visit.  Tr. 405.  Dr. Sivananthan commented that Criss was making "some progress" and replaced his Lamictal with Abilify.  Tr. 406.

Criss missed his May appointment (Tr. 407) and cancelled his June 9th appointment (Tr. 408).  On June 23, he saw Dr. Sivananthan again.  Tr. 563.  Criss stated that he was doing well.  Tr. 563.  He was still sleeping 8 hours a night and he still had anxiety but it was controlled with medications; without medications, it was unmanageable.  Tr. 563.  He had not had a panic attack since the last visit, in April.  Tr. 563.  He had not been able to start therapy because of problems with his newborn son.  Tr. 563.  He had not abused substances for 2.5 weeks.  Tr. 563.  He was medication compliant; Dr. Sivananthan commented that his bipolar medications were at a good stabilizing dose and continued his medications, adding Lexapro to address his general anxiety disorder.  Tr. 563-564.

Criss cancelled his July appointment.  Tr. 565.  He walked out of his August appointment, which was to be with Erum Ahmad, M.D, stating that he did not wish to be seen by

a new provider despite Dr. Sivananthan having notified him that his care was being transferred to Dr. Ahmad. Tr. 566. "He was difficult to engage in any attempts for redirection or establishment of rapport and walked out of the lobby." Tr. 566.

On September 24, 2014, Criss went to the emergency room with a groin injury from "playing football last night 7 pm. in street with friends, no pads." Tr. 587. His mental exam findings were normal. Tr. 588.

On October 6, 2014, Criss saw Dr. Ahmad. Tr. 567. He stated that he needed help and was cooperative during the interview. Tr. 567. He described life stressors of a 5-month old baby and his relationship with the baby's mother, with whom he argued regularly. Tr. 567. Since his last visit, he has been having problems with anxiety but his anger was under control. Tr. 567. He was still taking his medications. Tr. 567. He reported 3-4 panic attacks a day and his mother said that he was starting to isolate more. Tr. 567. His mood had been "alright" but tended towards depression. Tr. 567. He was still sleeping well and he also experienced racing thoughts, which he did not think were connected to his anxiety. Tr. 567. Dr. Ahmad increased his Lexapro and recommended regular counseling. Tr. 568-569.

On November 3, 2014, Criss saw Dr. Ahmad and stated that he was doing okay and had no side effects from the increased medication, but had not observed any significant improvement. Tr. 570. He was not arguing with his girlfriend as much and said that he was more irritable, which his mother described as becoming more "on edge" and starting to "snap." Tr. 570. Criss identified no triggers for these attacks and reported having them once a day. Tr. 570. He also reported mood swings, although he could not qualify his symptoms or "describe [the] full extent of impairment." Tr. 570. Dr. Ahmad increased his Abilify and recommended counseling and stress management techniques. Tr. 571.

Criss cancelled his December 6 appointment with Dr. Ahmad. Tr. 572. On December 13, 2014, Criss went to the emergency room for a back injury after he was playing football and another player hit him in the lower back. Tr. 615.

On January 8, 2015, Criss returned to Dr. Ahmad and reported that he was doing "good." Tr. 573. His mood swings were "under control," his anxiety was "under control," and he denied any panic attacks. Tr. 573-574. Dr. Ahmad wrote, "[m]ood swing and anxiety remain under control with current medication regimen." Tr. 574.

Criss missed his February appointment with Dr. Ahmad (Tr. 575) and returned on March 19, 2015. Tr. 576. He reported that his car was his biggest problem and he was anxious about the cost of fixing it and tended to "overthink" when he got anxious. Tr. 576. He admitted to "sometimes forgetting to take his medications" and had still not made an appointment with the counselor, although he knew he needed to do so. Tr. 576. Overall, his mood was "okay" and his anxiety was his main concern. Tr. 567. Dr. Ahmad suggesting switching his medication to Effexor and Criss said that he would think about it. Tr. 567. Dr. Ahmad concluded that Criss appeared to be doing well over the past few months but had increased anxiety and panic attacks in the context of stress associated with his car. Tr. 577.

Criss missed his June 11th appointment and saw Dr. Ahmad a week later on June 18th. Tr. 578-579. He was doing okay and denied worsening symptoms. Tr. 579. His energy level had been good, he was sleeping okay, and had not yet made contact with the counselor although he had tried. Tr. 579. Dr. Ahmad suggesting cutting back on the Klonopin; Criss seemed indifferent about it but, after discussing the benefits, he agreed to try it. Tr. 579. Dr. Ahmad commented that Criss was doing well over the past few months, his anxiety varied depending on

stressors, but that his anxiety had been stable and the use of other coping skills would be beneficial.  Tr. 580.

At an appointment with Dr. Ahmad on August 10, 2015, Criss told the doctor he did not leave the house much lately because he started thinking about things and found it hard to leave. Tr. 581.  He felt anxious about taking care of his baby and had a new appointment coming up that made him anxious also and that he gets anxious around people he doesn't know.  Tr. 581. Dr. Ahmad reminded Criss that anxiety can be caused by seeing a new provider and that he would no longer be seeing him, Dr. Ahmad, but a new doctor the next time.  Tr. 581.  Criss stated that he felt that he would not react the way he had in the past when his provider had changed.  Tr. 581.  Dr. Ahmed concluded that Criss reported anxiety and irritability in the context of psychosocial stressors, also likely due to avoidant behavior.  Tr. 582.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinions

On June 23, 2014, Dr. Sivananthan completed a functional capacity assessment on behalf of Criss.  Tr. 412-414.  Dr. Sivananthan stated that Criss was constantly anxious during appointments and that his mood was improved on medication.  Tr. 413.  His cognitive functioning was intact but he would have problems with concentration and attention if his anxiety were unmanageable, "which it can be in public settings."  Tr. 413.  He was limited in his ability to interact with others in social settings due to severe generalized anxiety disorder and panic disorder.  Tr. 414.  His bipolar disorder responded well to treatment but his anxiety disorder was still inadequately controlled with Lexapro and Klonopin.  Tr. 414.

On August 10, 2015, Dr. Ahmad completed a medical impairment questionnaire.  Tr. 415-416.  Dr. Ahmad stated that Criss had reported a high level of anxiety which made it

difficult for him to interact socially, and that he reported symptoms of panic attacks. Tr. 415. His prognosis was good. Tr. 415. Dr. Ahmad opined that Criss had a satisfactory ability to carry out short, simple and detailed instructions and perform activities within a schedule; he was seriously limited, but not unable, to maintain attention and concentration for extended periods, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, and adapt; and he was unable to meet competitive standards in the following areas: understanding and remembering short, simple, and detailed instructions, respond to supervisors and getting along with others without distracting them or being distracted by them and exhibiting behavioral extremes, and sustaining an ordinary routine. Tr. 415. He would be absent 2-3 days a week and would be off-task 40-50% of the time, Tr. 415.

### 2. Consultative Examiner

On March 17, 2014, Criss saw psychologist Mitchell Wax, Ph.D., for a consultative examination. Tr. 351. At the time, he was taking Klonopin. Tr. 352. Criss' reported daily activities included having a girlfriend who visited him most evenings, watching television, playing video games, and visiting with a neighbor for hours during the day and playing video games. Tr. 353. He did not like to go to the store because he does not like being around a lot of people, although he goes to the corner store "only when I have to." Tr. 353. He had three close friends, two of whom he spoke to daily; a close relationship with his sister, whom he spoke to daily; a close relationship with his mother, whom he lived with; and was close to his girlfriend, to whom he was engaged. Tr. 353. Dr. Wax remarked that Criss described his usual mood as anxious and depressed and observed him to be "a bit anxious but was often argumentative" and that "[h]is anger issues are believed part of his bipolar disorder." Tr. 353-354. He used to get into fights but now he just got into arguments. Tr. 353-354. During the evaluation, Criss

fidgeted intermittently and stated that he had difficulty with fidgeting, pacing and hyperventilating.  Tr. 354.  He reported daily panic attacks: his heart beats fast, his head felt weird and he feels like he is going to pass out.  Tr. 354.

Upon exam, he was oriented, showed no evidence of confusion, and had intermittent problems with concentration.  Tr. 354.  His flow of conversation and thought was moderate to good and he was argumentative at times.  Tr. 354.  Dr. Wax commented that, although Criss endorsed memory problems, no major problems were observed during the evaluation.  Tr. 354.  He diagnosed Criss with bipolar disorder and "polysubstance dependence in recent remission (ecstasy, snorting heroin and snorting cocaine)."  Tr. 354.  He opined that Criss could understand, remember, and carry out instructions, would have difficulty maintaining attention and concentration due to bipolar disorder but could perform simple tasks and multi-step tasks, would not respond appropriately to supervisors and coworkers due to bipolar disorder and being argumentative, and he would not respond appropriately to work pressures due to bipolar disorder and isolating himself when becoming irritable.  Tr. 355.

### 3. State Agency Reviewers

On March 24, 2014, state agency reviewing psychologist Janet Souder, Psy.D., reviewed Criss' record.  Tr. 86-88.  Regarding Criss' mental residual functional capacity, Dr. Souder found that Criss could perform simple, routine tasks (1-3 steps) with no production quotas, can complete a normal workweek but would need occasional flexibility of schedule and opportunities for reminders and redirection, can have superficial interactions with co-workers and supervisors and no interaction with the general public.  On July 17, 2014, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Criss' record and generally adopted Dr. Souder's opinion.  Tr. 102-104.

**D. Testimonial Evidence**

**1. Criss' Testimony**

Criss was represented by counsel and testified at the administrative hearing. Tr. 40-68. He likes to play sports "when he can," or about once a month, at most. Tr. 45-46. His friends want him to go out a lot but he hardly ever does. Tr. 46. He dropped out of ninth grade because he was switching over to a new school and the kids were mean to him and he did not want to go through with it. Tr. 46. He was thinking about doing some online schooling because he does not like to leave the house. Tr. 46.

Criss has a son who is a year and a half old. Tr. 46. His son and girlfriend live about ten minutes away and he sees them at least three times a week, when they come over. Tr. 47. He has gone to their place one time. Tr. 47.

Criss was diagnosed with bipolar disorder when he was six. Tr. 47. Currently he is taking Abilify, Celexa and Klonopin. Tr. 48-49. The highs and lows of his bipolar are evened out more on these medications. Tr. 50. He stated, "I think I have my bipolar well controlled...With the medicines." Tr. 50. He did not feel his anxiety was as controlled. Tr. 50. He thinks his anxiety started in 2013 "literally out of nowhere." Tr. 50-51. He used to smoke marijuana but the last time he did so was [about three months prior] in June; he had to quit because "every time I did it would start an anxiety attack." Tr. 51. The ALJ also asked him about his report to Dr. Wax, the consultative examiner, that he had abused alcohol but also that he only drank a couple times a year and last drank three days before the consultative exam. Tr. 51. Criss explained that he used to occasionally drink alcohol but does not "even do that really anymore because the day after my anxiety is just off the walls." Tr. 52. Criss agreed that when he would get high or drank too much it would bring on more anxiety. Tr. 53. He is not sure

what started his anxiety attacks a few years ago; his primary care physician thinks it is his past drug use. Tr. 68. Criss thinks it may be difficult things he went through as a child. Tr. 68.

The ALJ asked Criss if he had told his provider that his medication is not controlling his anxiety and Criss stated that he had. Tr. 53. The ALJ asked if they had been adjusting dosages and Criss responded, "No." Tr. 53. He stated, "Actually she has...she has cut me down on my anxiety meds." Tr. 53. The ALJ asked if Criss had told her that they were not working and Criss answered that he is trying to but they were in the middle of the process of switching his doctors because his prior doctor has left the office. Tr. 53. The ALJ asked, "So is there any doctor out there that you've actually said the medications aren't working for my anxiety right now?" and Criss answered, "I have not straight up told my doctor, like, that no." Tr. 54.

On a typical day, Criss does not go out. Tr. 54. Some months he does not go out at all. Tr. 54. "The closest I get to leaving the house per week is taking my dogs outside in the back yard." Tr. 54. He never goes for walks and he does not have a drivers' license. Tr. 55. He gets together with his friend, who is his neighbor. Tr. 55. Generally, Criss plays video games and watches television. Tr. 56. Sometimes his friends come over to play video games. Tr. 67. Previously, Criss had a job for a week roofing. Tr. 56. It was "decent" but he had a fear of heights, although he was able to deal with it. Tr. 56. He had to stop working because he could not keep dealing with the heights; the roofer kept wanting to put him on three-story houses. Tr. 56.

When Criss' anxiety starts to increase his heart rate goes up. Tr. 60. It feels like his heart skips beats and is flipping over in his chest. Tr. 60. This happens to him every night. Tr. 60. If he eats chocolate or drinks caffeine it could cause his palpitations and also increase his anxiety. Tr. 60. He often feels like he needs to exercise but it is just hard to get himself out of the house.

Tr. 60-61.  When he does leave the house, he starts thinking that something bad is going to happen to him; he could get robbed, jumped, shot, or anything like that.  Tr. 62.  His heart starts to race and, even if he is in someone's car, he likes to stay in the car and keep the doors locked.  Tr. 62.  For example, he has been in his sister's car pulling into a gas station and seeing people made him instantly start going into an anxiety attack.  Tr. 62.  He doesn't like seeing people he doesn't know.  Tr. 62.

Criss goes to the Metroparks to play sports about once a month.  Tr. 63, 66.  There is a basketball court hidden in the woods and he and his friend go and only stop the car if there is no one at that court.  Tr. 63.  If anybody is there, they have to go find another location without anyone there.  Tr. 63.  While playing basketball he is pretty nervous because, unlike when he is in a car and they can just drive away if something happens, when he is in the woods there is nowhere to go.  Tr. 63.  While playing, he has to sit down every five or ten minutes to let his heart rate calm down from his anxiety and from getting exercise.  Tr. 64.  He has asthma and smokes a pack of cigarettes a day.  Tr. 53, 58.  While playing, he is always looking over his shoulder.  Tr. 64.  He usually plays for a half-hour and the longest he has played was an hour.  Tr. 64.  He doesn't stop feeling nervous until he is back in his house, although it takes time for his heart to calm down and his anxiety level to go down.  Tr. 64.

When asked if he had issues staying focused or getting things done in his house and to function more normally, Criss stated that he is a little bit more normal but he still has at least four anxiety attacks a day inside the house.  Tr. 65.  He still has trouble getting things done around the house because he is very easily distracted and, when he is in the middle of an anxiety attack, he runs to the back porch or locks himself in his bedroom to try to deal with it.  Tr. 65.  The attacks he has inside his house are slightly better than the ones he has outside his house.  Tr. 65.  A few

times he has run out of medications before he can see his doctor and it was awful and really hard on him. Tr. 65. Other than when he runs out for a couple of days before he can get back on his medication, he takes his medications consistently. Tr. 66. The medications make him feel better but they don't stop him from having panic attacks. Tr. 66. He explained, "if I'm in the middle of an anxiety attack and I take an anxiety pill, it will calm me down for the mean time" but it doesn't take it away completely. Tr. 66. Anything can bring on an anxiety attack in his house; people arguing or fighting on a television show or playing a football video game that gets close in the fourth quarter. Tr. 67

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Dr. Robert Mosley testified at the hearing. Tr. 69-73. The ALJ asked the VE to determine whether a hypothetical individual with Criss' vocational background could perform work if the individual had the following characteristics: can perform work at the medium exertional level; can occasionally climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs as well as balance, stoop, kneel, crouch and crawl; must avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated areas; can perform simple, routine tasks with no fast paced work or strict production requirements; only simple work instructions and decisions and minimal or infrequent changes in the work setting; and can have occasional and superficial interaction with coworkers and occasional interaction with supervisors. Tr. 70. The VE answered that such an individual could perform work as a cook helper (600,000 national jobs, 3,000 regional jobs); hand packager (200,000 national jobs, 2,500 regional jobs); and kitchen helper (500,000 national jobs, 3,500 regional jobs). Tr. 71-72. The ALJ asked the VE to provide jobs that the hypothetical person could perform if he was limited to light instead of medium work and the VE stated that such an individual could perform work as a

cafeteria attendant (280,000 national jobs, 2,700 regional jobs); folder (200,000 national jobs, 2,000 regional jobs); and assembler (100,000 national jobs, 1,500 regional jobs). Tr. 77.

Next, Criss' attorney asked the VE whether either of the ALJ's hypothetical individuals could perform work if that person would occasionally require a flexible schedule and opportunities for occasional reminders and redirections in the work place. Tr. 74. The VE answered that such an individual could not perform work. Tr. 74. The ALJ asked Criss' attorney what the individual would need reminders of, and the attorney stated that he was phrasing it as the state agency reviewing physicians had. Tr. 74. The attorney put it another way: if, due to anxiety, the individual would have difficulty maintaining concentration in the work setting for two hour time periods. Tr. 75. The VE stated that such an individual would not be competitive. Tr. 75. Criss' attorney asked the VE whether the ALJ's hypothetical individuals could perform work if they would be off-task 40-50% of the time or absent 2-3 times a week and the VE answered no. Tr. 75.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his February 29, 2016, decision, the ALJ made the following findings:

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant has not engaged in substantial gainful activity since December 2, 2013, the application date.  Tr. 22.

2. The claimant has the following severe impairments: asthma; left knee degenerative joint disease, status post partial medial meniscectomy and anterior cruciate ligament reconstruction; obesity; bipolar disorder; and anxiety-related disorder with panic attacks and agoraphobia.  Tr. 22.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 23.

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can occasionally climb ladders, ropes or scaffolds; he can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and he should avoid concentrated exposure to fumes, odors, dust, gases, and poorly ventilated areas.  Claimant is further limited to simple, routine tasks with no fast-paced work; no strict production quotas; simple work instructions and decisions, and minimal or infrequent changes in the work setting; and he is limited to no direct work-related interaction with the public, occasional interaction with supervisors, and occasional and superficial interaction with coworkers.  Tr. 24-25.

5. The claimant has no past relevant work.  Tr. 29.

6. The claimant was born [i]n 1994 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 29.

7. The claimant has a limited education and is able to communicate in English.  Tr. 29.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 29.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  Tr. 29.

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 2, 2013, the date the application was filed.  Tr. 30.

## V. Plaintiff's Arguments

Criss argues that the ALJ's evaluation of the opinion evidence is contrary to the regulations and Sixth Circuit precedent.  Doc. 13, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Criss challenges the ALJ's assessment of the state agency reviewing psychologists. The ALJ considered the state agency reviewing psychologists' opinions as follows:

> As for the opinion evidence regarding the claimant's mental limitations, the State agency psychological consultants found that he could perform 2-3 step tasks and could maintain superficial interaction with coworkers and supervisors. They noted that the claimant needed positions that did not require interaction with the public. (Exhibits 1A/10-11, 3A/11-13). The undersigned gives significant weight to the opinions of the State agency psychological consultants, as they are consistent with the record. Specifically, the claimant is limited to simple tasks because of his racing thoughts, which makes it difficult for him to concentrate (Exhibits 12F, 14F/3-7, 19F/5-7). The claimant is limited to no strict production quotas and no fast-paced work because of increased anxiety in stressful situations (Exhibit 12F, Hearing Testimony). The claimant then has social limitations because of increased anxiety around new people and crowds (Exhibits 12F, 15F, 19F/19-20, Hearing Testimony). The claimant also has social limitations due to irritability around others related to his bipolar disorder (Exhibits 5F, 12F, 19F/8-9, Hearing Testimony).

Tr. 28.

Criss argues that the ALJ erred because, despite assigning "great weight" to the state agency reviewing psychologists' opinions, the ALJ did not include all the functional limitations

identified by the reviewers and did not explain his reasons for failing to do so.  Doc. 13, p. 17.

Specifically, Criss complains that the ALJ did not account for the reviewers' opinion that he

required "'occasional flexibility of schedule and opportunities for occasional reminders and

redirections,' and can only have superficial contact with coworkers and supervisors."  Doc. 13, p.

18.

First, an ALJ is not required to adopt, verbatim, a medical source's opinion.  *See Poe v.*

*Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) (The responsibility for

determining a claimant's residual functional capacity rests with the ALJ, not a physician, and the

ALJ "is not required to recite the medical opinion of a physician verbatim in his residual

functional capacity finding."); *Reeves v. Comm'r of Soc. Sec.* 618, Fed. App'x 267, 275 (6th Cir.

2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that

an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt

the state agency psychologist's limitations wholesale.").  Thus, the fact that the ALJ did not

adopt the state agency reviewers' opinions verbatim is not error.  *Id.*  Next, the ALJ's RFC did

account for Criss' social limitations; it limited him to no direct work-related interaction with the

public, occasional interaction with supervisors, and occasional and superficial interaction with

coworkers.  Criss' assertion that the ALJ erred because he failed specifically to explain why his

RFC did not limit him to occasional and superficial interaction with supervisors fails because an

ALJ is not required to explain why he included or excluded every facet of each opinion.  Here,

the ALJ provided a limitation for Criss' exposure to the public, coworkers and supervisors.

Moreover, elsewhere in his decision he explained that he did not find Criss to be severely limited

in his ability to interact with supervisors and in his ability to maintain attendance and sustain an

ordinary routine.  Tr. 29 (explaining that Criss' bipolar and anxiety disorders were managed with

medication and he regularly interacted with others).  Criss' argument that the ALJ failed to give good reasons for not adopting all the state agency reviewers' assessed limitations (Doc. 16, p. 2) fails because the "good reasons" rule only applies to treating physician opinions; it does not apply to state agency reviewers' opinions.  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (treating source opinions are entitled to controlling weight and the ALJ must give "good reasons" for discounting their opinions); 20 C.F.R. § 404.1527(c)(2).

Next, Criss complains that the ALJ left some parts of consultative examiner Dr. Wax's opinion "wholly unaddressed."  Doc. 13, p. 21.  The ALJ considered Dr. Wax's opinion:

> Consultative examiner, Dr. Wax, opined that the claimant could handle simple or multi-step tasks but that he could not respond appropriately to others (Exhibit 12F/6).  The undersigned gives some weight to the opinion of Dr. Wax, as it is somewhat consistent with the record.  The undersigned notes that the claimant has no further social restrictions, as he had improvement in his anxiety and irritability with medication.  Dr. Ahmad even found the claimant' anxiety and bipolar disorder to be managed with medication (Exhibit 19F/1-2, 8-9, 11-12, 14-15, 17-18, Hearing Testimony).  At the hearing, the claimant testified that his bipolar disorder is under control with medication (Hearing Testimony).

Tr. 29.  Criss does not challenge the ALJ's assessed reasons.  Instead, he asserts that Dr. Wax also opined the he would not be able to respond to work pressures in a work setting and that the ALJ did not mention this aspect of his opinion.  Doc. 13, p. 21.  As above, the ALJ is not required to discuss every limitation assessed by the consultative examiner.  Moreover, the ALJ accounted for pace restrictions by limiting Criss to simple, routine tasks with no fast-paced work, no strict production quotas, simple work instruction and decisions, and minimal or infrequent changes in the work setting.  Tr. 25.  Elsewhere in his decision, the ALJ explained why he did not find Criss to be entirely credible, which Criss does not challenge.[4]  The ALJ was not required to provide further explanation with respect to Dr. Wax's opinion.

---

[4]  After detailing Criss' medical history, the ALJ remarked that the record showed that Criss' anxiety was controlled by medication, his intermittent increased symptoms corresponded with his not being medication compliant, and that

Finally, Criss argues that the ALJ failed to properly evaluate the opinions of his treating sources, Drs. Sivananthan and Ahmad. Doc. 13, p. 22. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ discussed his evaluation of the treating source opinion evidence:

One of the claimant's treating providers, Dr. Sivananthan, opined in June 2014 that he would have problems with concentration if his anxiety were unmanageable, such as in public places (Exhibit 15F). The undersigned gives little weight to the opinion of Dr. Sivananthan, as it is inconsistent with the record. The record shows that the claimant noted improvement in his ability to be in public with medication (Exhibit 14F/15-16). Dr. Ahmad even found the claimant's anxiety to be managed (Exhibit 19F/1-2, 8-9, 11-12, 14-15, 17-18). The claimant's current treating provider, Dr. Ahmad, completed a mental source statement in August 2015 indicating that he could not meet competitive standards for regular attendance or sustaining an ordinary routine. Dr. Ahmad further found that the claimant had a serious limitation in interacting with the public and unable to meet competitive standards for responding to supervisors (Exhibit 16F). The undersigned gives little weight to the opinion of Dr. Ahmad, as it is inconsistent with the record. Yet, Dr. Ahmad continuously noted throughout 2014 and 2015 that his anxiety and bipolar disorder were managed with medication (Exhibit 19F/1-2, 8-9, 11-12, 14-15, 17-18). At the hearing, the claimant testified that his bipolar disorder is under control

_____

Dr. Ahmad had recently started decreasing Criss' anxiety medication (because it was under control) and the effects of this were unclear as it had just happened. Tr. 27-28.

> with medication (Hearing Testimony). The claimant also noted an ability to interact, including playing basketball with friends (Exhibit 20F/2, 62).

Tr. 29.

Regarding Dr. Sivananthan's opinion, Criss complains that the ALJ engaged in a limited analysis, did not discuss Dr. Sivananthan's opinion that Criss would be limited in his interaction with others, and did not appear to consider the relevant factors necessary when considering opinion evidence, such as the fact that Dr. Sivananthan met with Criss on at least three occasions and was a mental health specialist.[5] Doc. 13, p. 22. An ALJ is required to consider the factors in 20 C.F.R. § 416.927(c) but is not required to mention and explain his consideration of these factors. *See Francis v. Comm'r of Soc. Sec*., 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the regulations instruct an ALJ to consider [the length, nature, and extent of the treatment relationship], they expressly require only that the ALJ's decision include 'good reasons...for the weight...give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."). Furthermore, the ALJ explained why he gave little weight to Dr. Sivananthan's opinion—it was inconsistent and unsupported by the record. Notably, Dr. Sivananthan's opinion was based on the fact that Criss would have problems if his anxiety were unmanageable in public and the ALJ explained that Criss' medication helped manage his anxiety in public. Criss does not dispute the ALJ's findings regarding the ALJ's recitation of the record evidence (Tr. 23-24, 26-27) or his assessment of Criss credibility (Tr. 27-28). And, although Dr. Sivananthan opined that Criss was "limited in his ability to interact with others" (Tr. 414), he did not offer a more specific limitation. The ALJ limited Criss to no interaction with the public, occasional and superficial interaction with coworkers, and occasional interaction with

---

[5] Criss states that Dr. Sivananthan treated him "regularly between October 2014 and August 2015" (Doc. 13, p. 23) but Dr. Sivananthan stated that he first saw Criss in January 2014 and last saw him in June 2014 (Tr. 412). Dr. Sivananthan treated Criss three times during these five months and Criss cancelled or missed six appointments.

supervisors, and Criss does not explain how the ALJ's assessed limitation is inconsistent with Dr. Sivananthan's assessed limitation.

With respect to Dr. Ahmad's opinion, Criss complains that the ALJ did not discuss 23 specific areas that Dr. Ahmad assessed, in 10 of which he opined that Criss was unable to meet demands of competitive employment. Doc. 13, pp. 22-23. Specifically, he asserts that the ALJ did not discuss Dr. Ahmad's finding that Criss could not perform activities within a schedule, be absent from work excessively, and would off task up to 50% of the time. Doc. 13, p. 23. Actually, Dr. Ahmad opined that Criss had a satisfactory ability to perform activities within a schedule. Tr. 415. As for excessive absences and off-task time, the ALJ discussed Dr. Ahmad's finding that Criss could not competitively maintain "regular attendance or sustaining an ordinary routine" (Tr. 29), which adequately sums up many of Dr. Ahmad's assessed limitations. The ALJ did not need to explain each of the 23 lines on Dr. Ahmad's opinion form to provide a reasoned opinion.

Criss argues that the ALJ misrepresented Criss' testimony about his ability to engage in activities and that the ALJ's remark about Criss' bipolar disorder being controlled by medication was incomplete because it "fails to address [Criss'] other impairment—his anxiety." Doc. 13, p. 24. The ALJ accurately remarked that Criss testified that his bipolar disorder is controlled by medication. Tr. 29, 50 (Criss' testimony: "I think I have my bipolar well controlled."). The ALJ understood that Criss had both bipolar disorder and anxiety disorder. E.g., Tr. 50 (ALJ confirming with Criss at the hearing that his testimony was that his bipolar was controlled with mediation but not his anxiety); 22 (ALJ's decision listing severe impairments of bipolar disorder and anxiety-related disorder with panic attacks and agoraphobia); 28-29 (ALJ's decision, "Dr. Ahmad even found the claimant's anxiety and bipolar disorder to be managed with medication"

and listing treatment notes from Dr. Ahmad showing Criss' anxiety was managed with medication and elsewhere observing that Criss reported to Dr. Ahmad in June 2014 that he had not had a panic attack in over two months, reported in January 2015 that his anxiety was under control and he was not having panic attacks, Dr. Ahmad stating in March 2015 that Criss' anxiety had been managed over the last few months and that when his symptoms increased, Criss had not been taking his medication). Criss concedes that his anxiety medication was reduced in June 2015 because he had been feeling well. Doc. 13, p. 24. The ALJ did not fail to address Criss' anxiety as a separate impairment.

Nor did the ALJ misrepresent Criss' testimony about his ability to engage in activities. The ALJ observed that Criss played basketball with friends. Tr. 29 (citing Exhibit 20F/2, 62). Criss argues that he had testified that he played basketball with a single friend in a secluded spot. Doc. 13, p. 24. He also testified that, if that secluded spot were being used by others, he and his friend would drive to find another basketball court. Tr. 63. Moreover, the ALJ cited two separate instances wherein Criss went to the emergency room after being injured (1) playing in a football game "in street with friends" and (2) playing basketball and having "someone grab onto him." Tr. 29 (citing 587, 647); see also Tr. 615 (emergency room visit for lower back pain from playing football the day before when another player hit him in the back). The ALJ did not misrepresent Criss' testimony or the evidence in the record.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: July 10, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge